1 F.3d 1464
 144 L.R.R.M. (BNA) 2237, 144 L.R.R.M. (BNA)
2576, 62 USLW 2231,
126 Lab.Cas. P 10,871,
1993-2 Trade Cases 70,350
 SHEET METAL WORKERS LOCAL UNION NO. 54, AFL-CIO,
Plaintiff-Counter Defendant-Appellee,
v.
E.F. ETIE SHEET METAL CO., Defendant-Counter Plaintiff-Appellant,
v.
SHEET METAL WORKERS LOCAL UNION 54, AFL-CIO, et al.,
Counter-Defendants-Appellees.
 No. 92-2209.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 3, 1993.
Opinion Granting Rehearing in Part and Denying Rehearing in
Part Sept. 29, 1993.
 
 James J. Loeffler, Houston, TX, for appellant.
 Stuart B. Johnston, Jr., Dallas, TX, for Houston Sheet Metal Contractors.
 Donald W. Fisher, Toledo, OH, for Sheet Metal Workers Int. Ass'n.
 Patrick M. Flynn, Houston, TX, for Sheet Metal & Air Cond. Contractors Local Union.
 David R. Hols, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, MN, for Sheet Metal & Air Cond., et al.
 Appeals from the United States District Court for the Southern District of Texas.
 Before GARWOOD and HIGGINBOTHAM, Circuit Judges, and SCHWARTZ*, District Judge.
 PATRICK E. HIGGINBOTHAM, Circuit Judge:
 
 
 1
 A former member of a multi-employer bargaining association sues the association and the union it dealt with for antitrust violations, breach of fiduciary duty, and common law fraud, all part of an asserted effort to drive the member out of business. The district court found that any concerted efforts were labor activity, freed from the antitrust laws, and that the company's problems were of its own making, enforcing an arbitration award against it and dismissing its counterclaims. We agree with the district court, affirming its decisions as to the counterclaims and upholding in substantial part its enforcement of the arbitration award.
 
 I.
 
 2
 Several different entities play roles in this case. The Sheet Metal and Air Conditioning Contractors' National Association, SMACNA, is a national trade association of employers in the sheet metal contracting industry. The Houston Sheet Metal Contractors' Association, HSMCA, is a chapter of SMACNA that engages in collective bargaining with Local 54 of the Sheet Metal Workers' International Union, SMWIA, to achieve a single contract between HSMCA members and the union. HSMCA's Labor Committee, made up of large and small contractors specializing in various types of sheet metal work to ensure representation for different contractors, makes bargaining decisions on behalf of HSMCA members. Negotiations are often guided by the Standard Form of Union Agreement, SFUA, a form agreement drafted by the National Joint Adjustment Board, NJAB. The NJAB is an unincorporated panel of individuals, half of whom are appointed by SMACNA and the other half of whom are appointed by SMWIA. The SFUA is recommended as a pattern labor agreement which the local parties may adopt in whole, or in part.
 
 
 3
 In 1974, E.F. Etie Sheet Metal Co., a Houston sheet metal contractor, joined HSMCA and SMACNA and signed a written contract with HSMCA authorizing it to be Etie's exclusive bargaining agent with Local 54. HSMCA then negotiated a labor agreement with Local 54 for 1982 through 1985.[1]
 
 
 4
 1983 brought a recession to south Texas and an accompanying infusion of nonunion contractors into the sheet metal business. Needing relief from the current contract, HSMCA negotiated with Local 54 for an extension of the labor agreement to March 31, 1986, in exchange for a reduction in wages and changes in the required composition of the workforce. Due to a continuing decline in the construction industry, HSMCA sought further wage reductions from Local 54 in August of 1984 which the union was unwilling to make. HSMCA and Local 54 then agreed to an "interest arbitration" provision allowing the NJAB to arbitrate disputed contract provisions.[2] HSMCA and Local 54 bargained over more competitive provisions but deadlocked on several issues. They submitted these unresolved issues to the NJAB. The NJAB's decision included a reduction in wages for certain employees and directed the parties to execute a new agreement effective October 1, 1984 through March 31, 1986 that would include SFUA's interest arbitration clause.[3]
 
 
 5
 On April 11, 1985, Etie terminated its membership in HSMCA and SMACNA, and gave notice that it "wishes to terminate such Union Agreement, if any, at the earliest possible date." However, Etie continued to abide by the terms of their contract through the contract's March 1986 expiration date. The contract provided that if no new agreement had been reached by the expiration date, the contract would continue to bind the parties from year to year.
 
 
 6
 In March and April of 1986, Etie negotiated directly with Local 54. In May, after three bargaining sessions, and over Etie's objections, Local 54 submitted the contractual disputes. NJAB met on June 24, but Etie did not attend, and on June 27 issued a unanimous decision ordering Etie to execute an agreement on the same terms as the contract between Local 54 and HSMCA, except Etie's contract need not contain the interest arbitration provision. Etie refused to abide by this decision, and on July 2, began operating a nonunion shop. On July 14, Local 54 filed this suit to enforce NJAB's decision. Etie went out of business in October.
 
 
 7
 On March 27, 1987, Etie filed its Second Amended Counter-Claim claiming that all appellees had violated the Sherman Antitrust Act by conspiring to fix prices and drive Etie out of business and had engaged in a continuing fraud; that Local 54 and SMWIA had engaged in multiple unfair labor practices in violation of the National Labor Relations Act; and that HSMCA and SMACNA had breached Etie's 1974 written exclusive bargaining agency contract and breached their fiduciary duty to Etie.
 
 
 8
 In December, the district court dismissed Etie's antitrust counterclaim, ruling that it fell within an antitrust exemption. It also (i) dismissed Etie's breach of fiduciary duty and fraud claims as preempted by the National Labor Relations Act and barred by the Texas two year statute of limitations; (ii) granted summary judgment to HSMCA on Etie's breach of contract claims, finding that Etie implicitly authorized HSMCA to agree to interest arbitration before the NJAB; and (iii) denied Etie's summary judgment motion and granted Local 54's and SMWIA's motion to dismiss on Etie's unfair labor practices claim, because Etie was arguably bound under the 1984 contract to the interest arbitration provision.
 
 
 9
 After disposing of all of Etie's claims, Local 54's original claim seeking enforcement of NJAB's decision was tried to the bench. On February 28, 1992, the district court issued its final judgment and findings of fact and conclusions of law, finding for Local 54 by determining that Etie was bound to the 1984 contract, and that NJAB had the power to decide the dispute.
 
 II.
 
 10
 We first address Etie's state law claims for fraud, breach of fiduciary duty, and breach of contract. The district court erred in dismissing the fraud and breach of fiduciary duty claims as barred by limitations and preempted by the National Labor Relations Act. The district court correctly found that HSMCA acted within authority of its contract with Etie, and we affirm its grant of summary judgment on the breach of contract claim. The finding that HSMCA acted within its authority leaves no fact issue on the other state law claims.
 
 
 11
 The district court dismissed the claims as barred by a two year statute of limitations under Coastal Distributing Co. v. NGK Spark Plug Co., 779 F.2d 1033 (5th Cir.1986). The Texas Supreme Court, interpreting the limitations statute at issue in Coastal Distributing, held that 1979 amendments to the Texas limitation statutes "make[ ] all fraud actions consistent, in that they have a four-year limitation period, regardless of the remedy sought." Williams v. Khalaf, 802 S.W.2d 651, 658 (Tex.1990) (construing Tex.Civ.Prac. & Rem.Code Sec. 16.051 (Vernon 1986)). That four year limitations period applies to breach of fiduciary duty claims as well. Spangler v. Jones, 797 S.W.2d 125, 132 (Tex.App.--Austin 1990, writ denied). The four year statute is not a bar since the earliest act Etie complains of occurred in October 1983 and the second amended counterclaim alleging fraud and breach of fiduciary duty was filed in March 1987.
 
 
 12
 The district court also concluded that Etie's claims for fraud and breach of fiduciary duty involved areas arguably regulated by section 8 of the National Labor Relations Act as unfair labor practices and were preempted under San Diego Building Trades Council v. Garmon, 359 U.S. 236, 245, 79 S.Ct. 773, 779-80, 3 L.Ed.2d 775 (1959). The critical inquiry in examining that conclusion is whether the controversy presented under state law to the courts is identical to or different from that which could have been, but was not, presented to the National Labor Relations Board, NLRB. Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 197-98, 98 S.Ct. 1745, 1757-58, 56 L.Ed.2d 209 (1978). That inquiry requires not only looking to the factual bases of each controversy, but also examining the interests protected by each claim and the relief requested. See Belknap, Inc. v. Hale, 463 U.S. 491, 510-11, 103 S.Ct. 3172, 3183-84, 77 L.Ed.2d 798 (1983); Sears, 436 U.S. at 188-89, 198, 98 S.Ct. at 1752-53, 1758.
 
 
 13
 The district court reasoned, and the appellees contend before us, that the substance of Etie's fraud and breach of fiduciary duty claims is that HSMCA and Local 54 unlawfully collaborated to drive Etie out of business. The appellees cite two provisions of the NLRA as arguably implicated by Etie's allegations.[4] The first is section 8(a)(2) of the NLRA, making it an unfair labor practice for an employer to contribute financial or other support to any labor organization. 29 U.S.C. Sec. 158(a)(2). Appellees contend that HSMCA's agreement with Local 54 to include the arbitration clause arguably constituted unfair support. The second provision cited is section 8(a)(1), which prohibits employers from interfering with, restraining or coercing employees in the exercise of their right to refrain from collective bargaining through representatives of their own choosing. 29 U.S.C. Sec. 158(a)(1). HSMCA, a coalition of employers, arguably reached an agreement with Local 54 to keep Etie's employees in the union.
 
 
 14
 The focus of both allegations differs from the state law claims. The state law claims focus on the grant of authority Etie gave to HSMCA in 1974, and ask whether that grant included the power to agree to interest arbitration. The question under section 8 assumes away that issue. It takes place later in time, once the HSMCA and Local 54 entered into a binding interest arbitration agreement, and asks if that agreement violates federal standards. Both labor law questions presuppose the question of power to enter the agreement at issue in the state claims.[5] An answer to those questions does not answer the state law questions.
 
 
 15
 The Supreme Court's decision in Belknap v. Hale lends support to our position. The Court concluded that hiring replacements for striking workers raised a question for the NLRB as an arguable NLRA violation. But the terms of the employment contracts for the striking workers, and the liability of the company for misrepresenting those terms, raised distinct state law questions. 463 U.S. at 510, 103 S.Ct. at 3183. As in this case the labor question assumed the existence of an obligation under state law. Because the state had a strong interest in defining the scope of such obligations, the court found no preemption. See also Windfield v. Groen Div., Dover Corp., 890 F.2d 764, 770 (5th Cir.1989) (recognizing that a "personal guarantee" of employment created obligations for the employer independent of its obligations under federal labor law).
 
 
 16
 Local 926, International Union of Operating Engineers v. Jones, 460 U.S. 669, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983), illustrates preempted state law claims. In Jones the Court found that Sec. 8(b)(1) of the NLRA, preempted a wrongful discharge claim, reasoning that the NLRA and state law claims shared a "fundamental" element. Both allegations required a finding that Jones' discharge was "the result of Union influence." Jones, 460 U.S. at 682, 103 S.Ct. at 1462. Both federal and state law presupposed the existence of a valid employment contract and both focused on the issue of breach. The Court saw that common ground as raising a sufficiently large risk of inconsistent decisions by the NLRB and the courts to justify preemption.
 
 
 17
 Etie survives preemption to fail on the merits, however. Under Texas agency law a grant of authority to an agent includes the implied authority to do all things proper, usual, and necessary to exercise that authority. E.g., Polland & Cook v. Lehmann, 832 S.W.2d 729, 738 (Tex.App.--Houston [1st Dist.] 1992, writ denied). The district court correctly held that Etie implicitly authorized HSMCA to agree to Article X, section 8.[6]
 
 
 18
 Several facts about the relationship support this conclusion. The NJAB was no stranger to their original bargaining agreement. Article X, Section 4 of the agreement provides for an appeal to the NJAB after repeated failures to resolve grievances "arising out of interpretation or enforcement" of their agreement. Section 5 provides that the NJAB is "empowered to render such decisions and grant such relief to either party" as it deems "necessary and proper." Section 6 gives the NJAB the power to cancel the agreement if one party refuses to comply with an arbitration agreement, and section 7 provides that "[e]xcept in case of deadlock, the decision of the National Joint Adjustment Board shall be final and binding." These provisions belie Etie's claim that HSMCA's status as its "exclusive" bargaining agent foreclosed any reliance on the NJAB.
 
 
 19
 Nor is there anything surprising about the use of an interest arbitration clause. This court has recognized it as one of the "general[ ] types or categories of labor arbitration." NLRB v. Columbus Printing Pressmen & Assistants' Union No. 22, 543 F.2d 1161, 1163 n. 4 (5th Cir.1976). See also Winston-Salem Printing Press & Assistants' Union v. Piedmont Publishing Co., 393 F.2d 221, 227 n. 10 (4th Cir.1968) (noting that the practice of arbitrating the terms of new contracts predates grievance arbitration and has a long record of success). Uncontroverted testimony in the record from Arthur Gowan of the HSMCA indicates that the identical interest arbitration clause is in about half of the sheet metal workers' contracts nationwide.
 
 
 20
 Etie contends that HSMCA added the clause in violation of its bylaws, which provide in part that "[m]ember firms may vote on all matters coming before the association." But Etie offers no evidence as to the meaning of "coming before." Arthur Gowan's uncontroverted testimony shows that the membership had voted to give the Association's Labor Committee the authority to negotiate such clauses, showing that Etie was not entitled to a vote as to this specific clause.
 
 
 21
 Because the contract authorized HSMCA to agree to the inclusion of the interest arbitration agreement, the district court properly denied Etie relief on its claims for breach of contract. Furthermore, since no evidence in the record shows that HSMCA abused its authorized power, this finding also disposes of the breach of fiduciary duty and fraud claims.[7] We affirm the district court's dismissal of the fraud and breach of fiduciary duty claims and its grant of summary judgment on the breach of contract claims.
 
 III.
 
 22
 The district court correctly granted summary judgment on the unfair labor practices counterclaim. Etie's second amended counterclaim alleges that appellees "forced and restrained ... Etie to join and maintain membership in HSMCA" in violation of Section 303(b) of the Labor Management Relations Act, 29 U.S.C. Sec. 158(b)(4)(A). Etie argues that by bringing the disputed provisions to arbitration, Local 54 "coerced" Etie into a de facto membership in HSMCA because the arbitration provision "compels it to act as if it were a member and submit collective bargaining disputes it has with union locals to the adjustment board." Mobile Mechanical Contractors Ass'n v. Carlough, 664 F.2d 481, 486 (5th Cir. Unit A Dec. 1981), cert. denied, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850 (1982). We find the analogy to Mobile Mechanical Contractors unpersuasive and affirm the district court's grant of summary judgment.
 
 
 23
 Etie contends that it was not bound by the interest arbitration agreement negotiated by HSMCA because, on April 11, 1985, it repudiated its prehire contract with Local 54, denying the union the right to invoke the interest arbitration clause or any other contractual provision against it.[8] The Supreme Court has expressly left open the issue of how to repudiate a prehire agreement, stating that "it is not necessary to decide in this case what specific acts would effect the repudiation of a prehire agreement-sending notice to the union, engaging in activity overtly and completely inconsistent with contractual obligations, or, as respondents suggest, precipitating a representation election pursuant to the final proviso in Sec. 8(f) that shows the union does not enjoy majority support." Jim McNeff, Inc. v. Todd, 461 U.S. 260, 271 n. 11, 103 S.Ct. 1753, 1759 n. 11, 75 L.Ed.2d 830 (1983). We conclude that under the cases since Jim McNeff Etie failed to repudiate the agreement.
 
 
 24
 Etie's sole action that it claims constitutes a repudiation was a letter sent from Etie to HSMCA on April 11, 1985, retracting its assignment of bargaining authority to the association and expressing a desire to terminate its contract with Local 54 "at the earliest possible time." Etie continued to pay until 1986 both the wages and industry funds required by its contract with Local 54. There is no evidence of acts inconsistent with the contract until after the interest arbitration clause had been invoked and the dispute sent to the NJAB in May of 1986, when a majority of Etie workers indicated to Etie that they no longer wished to be bound by Local 54.
 
 
 25
 The Seventh Circuit identified the incentives controlled by the rules in Gould v. Lambert Excavating, Inc., 870 F.2d 1214 (1989). In declining to find repudiation based on an employer giving notice and declining to follow certain contractual provisions, the court noted that when an employer "maintains that it repudiated the contract while at the same time admitting that it continues to comply with certain provisions and to enjoy certain of the benefits of the contract" an "ambiguous" situation results. Id. at 1219. The employer can selectively repudiate disadvantageous provisions, or can later renege on a statement that it completely repudiated the contract. Because this danger appears in a case such as this one where an employer's statements do not entirely match its actions, we hold that notice of a desire to terminate unaccompanied by any other actions inconsistent with the contract is not sufficient to repudiate the prehire contract.
 
 
 26
 We announce no recipe for repudiating a prehire agreement. The conduct we described in United Brotherhood of Carpenters and Joiners Local Union 953 v. Mar-Len of Louisiana, Inc., 906 F.2d 200, 201 (5th Cir.1990), where the employer refused to use the union's hiring hall, stopped contributing to the union's fringe benefit funds, refused to rehire laid-off workers, and sent notice to the union of its repudiation constitutes an effective repudiation. Less equivocal conduct requires a case-by-case inquiry given the differences between various prehire agreements and the different types of organizations that can bargain for a Sec. 8(f) agreement. See Operating Engineers Pension Trust v. Beck Engineering & Surveying Co., 746 F.2d 557, 565 (9th Cir.1984).[9]
 
 
 27
 Etie contends that even if it did not repudiate its prehire agreement with Local 54, the interest arbitration agreement did not bind its individual negotiations with Local 54 after it withdrew from the contractors' association. It is not so simple. An employer continues to be subject to an interest arbitration clause in its individual negotiations after withdrawing from an employer's association if it is "arguably" bound by the clause. Sheet Metal Workers Int'l Ass'n, Local Union No. 9, 136 L.R.R.M. (301 N.L.R.B. No. 32) 1338, 1991 WL 12488 (January 15, 1991) [Graco]. The Board found in Graco that a withdrawing employer was arguably bound by an interest arbitration clause that referred to "the Local Contractors' Association" rather than to individual employers. The agreement in this case contains even more specific language, referring to "employer(s) representatives."
 
 
 28
 Because the agreement bound Etie, the analogy to Mobile Mechanical fails. Mobile Mechanical involved a strike called to force an employer to accept an interest arbitration clause, which would have forced the employer to act as if it was a member of a national employers association by forcing it to submit disputes to a group of arbitrators selected by the national association. The strike violated Sec. 8(b)(4)(A) as the equivalent of an attempt to force an employer to join an employer organization. Mobile Mechanical, 664 F.2d at 484 (citing Frito-Lay, Inc. v. Teamsters, 401 F.Supp. 370 (N.D.Cal.1975)). While Etie was a member of an employer organization it became subject to an interest arbitration clause that bound it in later negotiations. Requiring an employer to honor obligations it incurred while an organization member forces no membership.
 
 
 29
 Etie also contends that even if Local 54 had a right to submit their dispute to interest arbitration, that right could only be invoked under conditions not present. Etie claims that Local 54 bargained to impasse over several nonmandatory subjects[10] so that it could wrongfully invoke the arbitration clause, leading to Etie being "forced and restrained" to remain a de facto contractors' association member in violation of Sec. 8(b)(4)(A).
 
 
 30
 It is true, as Etie argues, that an interest arbitration clause cannot be invoked solely because of an impasse over a nonmandatory subject of bargaining. See, e.g., NLRB v. Sheet Metal Workers Int'l Ass'n Local 38, 575 F.2d 394, 399 (2d Cir.1978). The gap between Etie and Local 54 in 1986, however, went beyond nonmandatory issues. Etie's counsel wrote to Local 54 after three negotiation sessions to declare that "the existence of the impasse has been and is now clear and unmistakable" because "all important issues" including wages, benefits, and overtime remained unresolved. The NJAB's 1986 award incorporated all terms of the agreement in effect at the time between HSMCA and Local 54. Given this broad gap between the parties on mandatory terms we find that Local 54 had the right to invoke interest arbitration even if their negotiations left some nonmandatory issues unresolved.[11]
 
 
 31
 Coercion did not bring Etie before the NJAB. The employer association it belonged to negotiated for the interest arbitration clause under a lawful grant of authority from Etie. Etie remained bound by that clause when it maintained its contract with the local union. Local 54 subjected Etie to the NJAB because Etie agreed to be subjected to the NJAB. We affirm the grant of summary judgment on the unfair labor practices counterclaim.
 
 IV.
 
 32
 Etie's antitrust counterclaim charges that a combination of the local and national manufacturers' associations, the local and national unions, and the NJAB conspired to insert the interest arbitration provision in the 1984 contract and to produce a NJAB award favorable to Local 54 in 1986. The combination sought to reduce competition for association members by keeping union employers from becoming nonunion contractor competitors. The district court found that the activity of the counterdefendants was protected from antitrust liability under a nonstatutory exception to the antitrust laws and granted summary judgment. We agree and affirm.
 
 
 33
 This well established nonstatutory exemption is a judicial implementation of the statutory policy favoring the association of employees to eliminate competition over wages and working conditions. Connell Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). Strict enforcement of the antitrust laws and collective union activity are at odds. Compatibility of labor and antitrust rules require that employee organizations receive some exemption from the antitrust laws. Id. at 622, 95 S.Ct. at 1835; United Mine Workers v. Pennington, 381 U.S. 657, 666, 85 S.Ct. 1585, 1591, 14 L.Ed.2d 626 (1965) (White, J.); Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (White, J.).
 
 
 34
 The required accommodation of conflicting policies dictates the scope of the exemption. Two themes recur. The first theme is that unions should focus on the labor market. "Direct" restraints on employers' product markets are not within the exception. Connell, 421 U.S. at 622, 95 S.Ct. at 1835. Connell involved a union that represented workers in the plumbing and mechanical trades. In negotiating with a general building contractor, it required that the contractor only subcontract mechanical work to firms that had a current contract with the union. The Court found that this requirement violated the antitrust laws as a "direct restraint on the business market" with "substantial anticompetitive effects" that "would not follow naturally from the elimination of competition over wages and working conditions." Id. at 625, 95 S.Ct. at 1836. See also Allen Bradley Co. v. Local 3, Int'l Brotherhood of Elec. Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945) (finding an antitrust violation when a union required that electrical contractors buy equipment only from local manufacturers with closed shop agreements with the union).
 
 
 35
 This arbitration clause only affected employers' product markets to the extent it subjected employers to a union contract. The only alleged harm of that contract was that it represented successful union wage negotiation, which was proper union activity. See Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 689-90 & n. 5, 85 S.Ct. 1596, 1602 n. 5, 14 L.Ed.2d 640 (1965) (White, J.).
 
 
 36
 The clause was introduced as part of a wage reduction strategy. Both employers and the union recognized the need to cut wages to compete with growing nonunion employers, but the union had concerns about most-favored-nation agreements it had with other major area employers. Interest arbitration allowed wage reductions that did not trigger most-favored-nation clauses, as the wage reductions resulted from arbitration rather than agreement.
 
 
 37
 The clause itself is not a mandatory subject of bargaining. Past decisions have expressed concern about extending the exemption to nonmandatory subjects. Jewel Tea, 381 U.S. at 689, 85 S.Ct. at 1601-02 (White, J.) (noting that the union and employer could not agree to a product price scale and stay within the exemption); Id. at 710 & n. 18, 85 S.Ct. at 1614 & n. 18 (Goldberg, J.) (noting that the NLRB's decisions about what subjects are mandatory topics are "very significant" in determining the scope of the exemption); Consolidated Express, Inc. v. New York Shipping Assoc., 602 F.2d 494, 517 (3d Cir.1979), vacated on other grounds, 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980). But these statements are just illustrations of the broader principle that unions should focus on the labor market rather than employers' product markets. See Connell, 421 U.S. at 622-23, 95 S.Ct. at 1835. A nonmandatory procedural device can be used to facilitate substantive agreement about wages or working conditions without offending that principle.
 
 
 38
 The second theme in the nonstatutory exemption cases is that the agreement between the union and an employer have some effect on third parties who had no chance to affect the negotiation or implementation of the agreement. For example, in United Mine Workers v. Pennington a small coal operator alleged that large coal operators and the United Mine Workers had conspired to drive it out of business. The union and the large operators had agreed to a wage and hour schedule and also agreed that the union would force the same terms on small operators as well. Justice White, writing for a plurality of the Court, held that the exception did not apply as "[o]ne group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy." 381 U.S. at 665-66, 85 S.Ct. at 1591; See also Connell, 421 U.S. at 619-20, 95 S.Ct. at 1833-34 (union representing an employers' association's workers illegally tried to impose conditions on an independent employer); Embry-Riddle Aeronautical Univ. v. Ross Aviation, Inc., 504 F.2d 896, 904-05 (5th Cir.1974) (union conspired with an employer to impose forbidden conditions on another employer).
 
 
 39
 This case is distinguishable from Pennington because Etie cannot claim to be the victim of a labor contract it could not affect. This interest arbitration clause was negotiated while Etie was a member of the HSMCA. The association members got the tangible benefit of a no-strike clause in exchange for the interest arbitration provision, suggesting that the parties weighed the risks and benefits of their actions in the negotiations. Further, under the law at the time, Etie had the right to unequivocally repudiate its relationship with the union and be free of the clause completely. Given Etie's status as a member of the association that negotiated the clause, coupled with its power to avoid the effect of the clause completely, the risks of allowing labor contracts to bind sectors of the economy that never had a chance to influence the contract are not present.
 
 
 40
 Viewed against the background of the negotiations between HSMCA and Local 54, the negotiation of the arbitration clause falls within the exemption. It was part of wage negotiations, Etie belonged to the association that negotiated it, and Etie had the chance to pull out of the agreement entirely.
 
 
 41
 No evidence suggests that a conspiracy infected any other stage of Etie's dealings with Local 54. Local 54's unilateral invocation of a legal remedy was within its rights. See Apex Hosiery Co. v. Leader, 310 U.S. 469, 503-04, 60 S.Ct. 982, 997-98, 84 L.Ed. 1311 (1940). And nothing suggests that a conspiracy orchestrated the NJAB's award. Etie can only point to statements by national union officials that show their awareness of the need to cut wages. Those statements at best show that the clause was negotiated as part of an agreement about wages. Cf. Embry-Riddle, 504 F.2d at 903-04.
 
 V.
 
 42
 The final issue is the enforceability of the NJAB award. In reviewing arbitration awards in labor disputes this Circuit uses a three-part test. It requires: (1) an agreement to arbitrate and the parties must be covered by that agreement; (2) an award which draws its "essence" from the agreement and does not exceed the scope of the issues presented to the arbitrator; and (3) an award which is not "repugnant" to the NLRA. General Warehousemen & Helpers Local 767 v. Standard Brands, 579 F.2d 1282, 1292 (5th Cir.1978) (en banc), cert. dismissed, 441 U.S. 957, 99 S.Ct. 2420, 60 L.Ed.2d 1075 (1979). The district court erred by only analyzing the agreement under the first two parts of the test.[12] We affirm the enforcement of the award in substantial part but strike two provisions as contrary to national labor policy.
 
 
 43
 Etie contends that the award is void as an imposition against its will of a prehire agreement. See generally Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1248 (3d Cir.1991) (noting that an 8(f) agreement must be voluntary). Etie's contention might have force if the award were not based on any prior relationship between the parties. Etie was, however, already in a voluntary 8(f) relationship at the time of the NJAB award. Its failure to repudiate the contract, coupled with the wording of the interest arbitration clause, subjected it to the NJAB. See Sheet Metal Workers Int'l Ass'n Local 110 Pension Trust Fund v. Dane Sheet Metal, 932 F.2d 578, 581-82 (6th Cir.1991). The parties could not agree on mandatory issues. Local 54 had a right to invoke the NJAB and enforce its award in court. Sheet Metal Workers Int'l Ass'n, Local Union No. 9, 136 L.R.R.M. (301 N.L.R.B. No. 32) 1338, 1991 WL 12488 (Jan. 15, 1991).
 
 
 44
 Etie then challenges specific provisions of the award as forcing it to agree to issues that it is not required to bargain over. In addressing Etie's counterclaim for damages we explained that the arbitration proceeding was properly invoked to settle disputes over mandatory bargaining issues. The question now is whether nonmandatory provisions can be imposed after a party invokes interest arbitration. The Second Circuit addressed this issue in NLRB v. Sheet Metal Workers Int'l Ass'n Local Union No. 38, 575 F.2d 394 (1978). The court held an interest arbitration provision void as contrary to public policy insofar as it applied to nonmandatory subjects. It reasoned that preserving parties' freedom to exclude nonmandatory subjects from labor agreements was an important goal of national labor policy. Id. at 399 (quoting and citing Chemical Workers Local 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 187, 92 S.Ct. 383, 401-02, 30 L.Ed.2d 341 (1971)). Insofar as an interest arbitration proceeding forced a party to put nonmandatory issues on the table, it was unenforceable as contrary to that policy.
 
 
 45
 Other courts have followed this rule. American Metal Prods., Inc. v. Sheet Metal Workers Int'l Ass'n, Local No. 104, 794 F.2d 1452, 1457 (9th Cir.1986);[13] Sheet Metal Workers' Int'l Ass'n, Local 14 v. Aldrich Air Conditioning, Inc., 717 F.2d 456, 459 (8th Cir.1983). Our own more limited precedent on the issue echoes the Second Circuit's reasoning and states that using an interest arbitration clause to perpetuate itself is against national labor policy. NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252, 543 F.2d 1161 (5th Cir.1976). The NLRB recently held that Article X, Section 8 of the SFUA was valid and enforceable only as to mandatory subjects of bargaining. Sheet Metal Workers Int'l Ass'n, Local Union No. 9, 136 L.R.R.M. (301 N.L.R.B. No. 32) 1338, 1991 WL 12488 (Jan. 15, 1991). We follow these decisions and hold that nonmandatory provisions in this NJAB award are not enforceable because Local 54 did not have the power to bring them before the Board by use of the interest arbitration clause.
 
 
 46
 Etie complains of four[14] allegedly nonmandatory provisions that appear in the agreement ordered by the NJAB. It is proper to analyze them one-by-one. No provision presents the "extraordinary circumstances that would render severance inappropriate" and require invalidating the entire award. See Sheet Metal Workers' Int'l Ass'n, Local 206 v. R.K. Burner Sheet Metal, Inc., 859 F.2d 758, 761 (9th Cir.1988); Sheet Metal Workers Int'l Ass'n, Local Union No. 9, 136 L.R.R.M. (301 N.L.R.B. No. 32) 1338, 1991 WL 12488 (Jan. 15, 1991) (both engaging in similar analyses).
 
 
 47
 The parties all agree, correctly, that the "Industry Fund" provision, requiring a contribution to the Sheet Metal Industry Fund of Houston based on hours worked by union members, is nonmandatory.[15] Sheet Metal Workers Local 38, 575 F.2d at 397-98. It is a void provision of the award.
 
 
 48
 The second provision requires contributions to the Stabilization Agreement of the Sheet Metal and Air Conditioning Industry, SASMI, an unemployment insurance fund maintained by the national union.[16] Participation in such a fund is a mandatory bargaining issue. Sheet Metal Workers' Int'l Ass'n Local 493, 234 N.L.R.B. 1238, 1978 WL 7341 (1978). Etie's concern that it will not be able to appoint a trustee of the fund do not affect that conclusion. See id.; Denver Metropolitan Ass'n of Plumbing, Heating, & Cooling Contractors v. Journeyman Plumbers & Gas Fitters Local No. 3, 586 F.2d 1367, 1374-75 (10th Cir.1978).
 
 
 49
 Third is the exclusive union hiring hall.[17] Its status as a bargaining provision depends on whether it presents a subject matter over which bargaining is mandatory. The test is whether the subject matter would settle any term or condition of employment, or would regulate the relations between the employer and employees. If so, in either event, bargaining is mandatory. NLRB v. Associated General Contractors, Inc., 349 F.2d 449, 452 (5th Cir.1965), cert. denied, 382 U.S. 1026, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966) (citing NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 350, 78 S.Ct. 718, 723, 2 L.Ed.2d 823 (1958)). This provision serves purposes similar to the one in Associated General Contractors, as it promotes job priority standards in an industry with many employers where employees move from job to job and employer to employer. We find that as applied to this industry the provision is mandatory.
 
 
 50
 The fourth contested provision is a subcontracting clause limiting Etie's ability to subcontract to nonunion employees.[18] The Supreme Court, in upholding the legality of such a "union signatory" subcontracting clause, withheld judgment on whether it was a mandatory bargaining subject. Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 664-66, 664 n. 17, 102 S.Ct. 2071, 2082-83 & 2082 n. 17, 72 L.Ed.2d 398 (1982). The Ninth Circuit has examined a similar provision and held that while it was lawful under section 8(e) of the National Labor Relations Act, 29 U.S.C. Sec. 158(e), it did not necessarily follow that the agreement was a mandatory subject of bargaining. NLRB v. Bricklayers & Masons Int'l Union, Local 3, 405 F.2d 469, 470 (9th Cir.1968). It reasoned that the provision directly benefitted the union "and only in a most attenuated sense, if at all" benefitted employees. We agree with the Ninth Circuit that the effect of the clause on wages and hours is too attenuated to constitute a mandatory subject under section 8(d), 29 U.S.C. Sec. 158(d). Since the clause is nonmandatory the part of the award imposing it is unenforceable.
 
 
 51
 Local 54 properly invoked interest arbitration to settle the far-reaching disagreements between the parties. But it overstepped its authority by urging the award of nonmandatory provisions, and such provisions that found a place in the final award are void. We affirm the district court's enforcement of the award in its substantial part except for the provisions regarding the industry fund and the subcontracting clause. Those two awards are unenforceable.
 
 
 52
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 53
 ON PETITION FOR REHEARING AND SUGGESTION FOR REHEARING EN BANC
 
 
 54
 Sept. 29, 1993.
 
 PER CURIAM:
 
 55
 The petition for rehearing en banc is denied, no member of the court having requested a poll. The petition for panel rehearing is denied except in one respect. In our original opinion we analyzed the "subcontracting clause" imposed by the arbitration award as a "union signatory" clause. On rehearing it is urged that the two sections of the subcontracting clause are more in the character of "union-standards clauses" designed to discourage subcontracting and to prevent the erosion of negotiated standards, without requiring subcontractors to actually join the local union. The NLRB has recognized that such clauses bear a sufficiently close relationship to wages and hours that they are mandatory bargaining subjects. Arizona Public Service Co., 247 N.L.R.B. 321, 1980 WL 11041 (1980). See generally Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 210-11, 85 S.Ct. 398, 402-03, 13 L.Ed.3d 1130 (1964). We modify our opinion striking the subcontracting clause from the arbitration award. We are now persuaded that as a mandatory bargaining subject the two sections of the subcontracting clause were properly included in the arbitration award and the district court properly chose to enforce them.
 
 
 56
 Petition for rehearing en banc is denied. Petition for panel rehearing is granted in part and denied in part.
 
 
 
 *
 Senior District Judge of the Eastern District of Louisiana, sitting by designation
 
 
 [1]
 This agreement was a prehire contract, or section 8(f) contract, which is a special exception for the construction industry to the general rules governing collective bargaining agreements. See 29 U.S.C. Sec. 158(f). A construction union and an employer in the construction industry may enter a contract without the employees having designated the union as their bargaining representative. These agreements may require, as a condition of employment, that employees join the union within eight days of being hired. Id
 
 
 [2]
 This provision is designated as Article X, Section 8 of the SFUA. It requires the negotiating parties to first attempt to agree on the substantive contract terms, but if they become "deadlocked," either party may submit the disputed term to NJAB for arbitration. The decision of NJAB is binding only if it is reached by unanimous vote of NJAB's members
 
 
 [3]
 The interest arbitration clause was modified by HSMCA and Local 54 in March of 1985. The clause formerly provided that: "Should the negotiations for a renewal of this Agreement become deadlocked in the opinion of the Local Union or of the Local Contractors' Association, or both, notice to that effect shall be given to the National Joint Adjustment Board." The words "Local Union or of the Local Contractors' Association" were changed to "Union representative(s) or of the employer(s) representatives." Notice of this change was sent to all HSMCA members on March 28, 1985
 
 
 [4]
 Appellees also contend that the entire area of multiemployer bargaining requires NLRB oversight because of its complexity and widespread effects. While those interests may weigh in favor of preemption in some cases, we decline to place every dispute about the conduct of employers' associations beyond the reach of state law
 
 
 [5]
 Appellees cite Manges v. Guerra, 673 S.W.2d 180, 185 (Tex.1984), for the proposition that fiduciary duties arise from a relationship between two parties rather than the contract between them. This distinction does not matter for purposes of our preemption inquiry, as the focal point of all state law claims in this case differs from that of the labor laws with which they arguably overlap
 
 
 [6]
 Etie characterizes the dispute as one about whether HSMCA could "delegate" its negotiating responsibilities to the NJAB. This mischaracterizes the relationship between HSMCA, Local 54, and the NJAB. The Board was a tool used by HSMCA and Local 54 to resolve their negotiating disputes rather than an independent party to the negotiations. See Mobile Mechanical Contractors Ass'n v. Carlough, 664 F.2d 481, 486 (5th Cir. Unit A Dec.1981), cert. denied, 456 U.S. 975, 102 S.Ct. 2240, 72 L.Ed.2d 850 (1982) (noting that the NJAB was formed to resolve disputes between employers and union locals). Further, the law of implied authority remains the same no matter the label. Texas agency law allows powers entrusted to an agent to be delegated if the authority to delegate may be implied from the nature and circumstances of the transaction. Powell v. State, 82 Tex.Crim. 163, 198 S.W. 317, 319 (1917)
 Etie also distinguishes the act of delegation from the act of impermissible extending the agency relationship by invoking the arbitration clause. For purposes of these state law claims that distinction does not matter, as an agent's power to use an arbitration clause includes the power to enter and to invoke it.
 
 
 [7]
 Counsel for Etie conceded at oral argument that if the contract authorized the insertion of the interest arbitration clause then its other state law claims would fail
 
 
 [8]
 Under John Deklewa & Sons, 282 N.L.R.B. 1375, 1987 WL 90249 (1987), an employer cannot repudiate a prehire contract. However, this court has held, without adopting the decision, that Deklewa is not retroactive. United Brotherhood of Carpenters & Joiners v. Mar-Len of Louisiana, Inc., 906 F.2d 200, 203-04 (5th Cir.1990). Prior to Deklewa an employer could repudiate a prehire contract under certain circumstances. Etie's alleged repudiation occurred before Deklewa
 
 
 [9]
 We treat as dicta the Tenth Circuit's statement that notice alone can constitute repudiation of a prehire contract in Trustees of Iron Workers Fund v. A & P Steel, 812 F.2d 1518, 1524 (10th Cir.1987). That case involved a full collective bargaining agreement rather than a prehire agreement, and no contested legal issue in the case turned on deciding what acts constituted repudiation of a prehire agreement. The facts of Plumbers & Pipefitters Local Union No. 72 v. John Payne Co., 850 F.2d 1535 (11th Cir.1988), where the court found repudiation on the basis of a much more strongly-worded statement than Etie used, are not before us
 
 
 [10]
 Wages, hours, and other terms and conditions of employment are considered mandatory subjects of collective bargaining, and either party may insist upon inclusion of a clause relating to those subjects. 29 U.S.C. Sec. 158(d); Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). However, it is unlawful to insist upon inclusion of clause relating to matters as to which collective bargaining is not mandatory. NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958)
 
 
 [11]
 Our conclusion can also be phrased in terms of "conditionality." Insistence on a nonmandatory issue becomes unlawful when the issue becomes a condition for an agreement. NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 722-23, 2 L.Ed.2d 823 (1957). When the parties cannot reach an agreement for other reasons the dispute on the nonmandatory issue is not a condition of agreement
 
 
 [12]
 Ordinarily allegations of unfair labor practices, such as bargaining to impasse over nonmandatory subjects, fall within the exclusive jurisdiction of the NLRB. Sheet Metal Workers' Int'l Ass'n v. Standard Sheet Metal, Inc., 699 F.2d 481 (9th Cir.1983). But it is well-established that in actions to enforce arbitration awards brought under Sec. 301 of the NLRA, federal courts have "jurisdiction ... over enforcement suits even thought the conduct involved was arguably or would amount to an unfair labor practice within the jurisdiction of the National Labor Relations Board." General Warehousemen & Helpers Local 767 v. Standard Brands, 579 F.2d 1282, 1288-89 (5th Cir.1978) (en banc), cert. dismissed, 441 U.S. 957, 99 S.Ct. 2420, 60 L.Ed.2d 1075 (1979) (citing Hines v. Anchor Motor Freight, 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976))
 
 
 [13]
 Sheet Metal Workers Int'l Ass'n, Local No. 252 v. Standard Sheet Metal, Inc., 699 F.2d 481 (9th Cir.1983), is not to the contrary. That case hinged on limitations issues that are not present here. American Metal Products shows that the Ninth Circuit does examine interest arbitration awards to determine their consistency with national labor policy
 
 
 [14]
 Etie also complains of an "Integrity Clause" that would penalize it for doing business with nonunion contractors. This clause did not appear in the 1986-1989 HSMCA-Local 54 agreement so it was not in the NJAB award
 
 
 [15]
 This provision appears in Article VIII, Section 12 of the SFUA and provides:
 The Employer agrees to promote programs of industry education, training, administration of collective bargaining agreements, research and promotion, such programs serving to expand the market for the services of the Sheet Metal Industry, improve the technical and business skills of Employers, stabilize and improve Employer-Union relations, and promote, support and improve the training and employment opportunities for employees. No part of these payments shall be used for political or anti-union activities.
 Effective April 1, 1986, the Employer shall pay to the Sheet Metal Industry Fund of Houston $0.13 per hour for each hour worked by all foremen, journeymen and apprentices covered by this Agreement.
 Payment shall be made monthly in accordance with the terms of the Trust agreement as amended, in contribution agreement in Addendum 2, and shall be remitted to the Sheet Metal Workers Local 54 Trust Fund administration, for transmittal to the Sheet Metal Industry Fund of Houston.
 
 
 [16]
 This provision appears in Section 6 of Addendum # 2 to Article VIII and provides:
 Effective on April 1, 1986, and until the termination of this Agreement, it is agreed that each Employer shall contribute and pay into the Stabilization Agreement of Sheet Metal Industry Fund an amount equal to 3% of the gross earnings of each foreman, journeyman and apprentice subject to this Agreement. The gross earnings include all reportable wages paid to the employee for Federal Income Tax purposes plus the contributions, excluding Apprentice and Building Fund, National Training Fund and Industry Fund. The payments are to be made in accordance with the terms of the Agreement and Declaration of Trust, establishing such Fund, as amended.
 
 
 [17]
 Article IV, Section 2 of the SFUA requires in relevant part "the following system of referral of applicants for employment: (a) The Union shall be the sole and exclusive source of referral of applicants for employment. (b) The Employer shall have the right to refuse any applicant for employment. (c) The Union shall select and refer applicants for employment without discrimination ... (d) The Union shall maintain a register of applicants for employment...."
 
 
 [18]
 Sections 1 and 2 of Article II of the SFUA provide:
 No employer shall subcontract or assign any of the work described herein which is to be performed at a job site to any contractor, subcontractor or other person or party who fails to agree in writing to comply with the conditions of employment contained herein including, without limitations, those relating to union security, rates of pay and working conditions, hiring and other matters covered hereby for the duration of the project.
 Subject to other applicable provisions of this Agreement, the Employer agrees that when subcontracting for prefabrication of materials covered herein, such prefabrication shall be subcontracted to fabricators who pay their employees engaged in such fabrication not less than the prevailing wage for comparable sheet metal fabrication, as established under provisions of this Agreement.